## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MELISSA KOGER,                    :
                                  :
                 Plaintiff        :        No. 3:16-CV-00090
                                  :
        vs.                       :        (Judge Nealon)
                                  :
NANCY A. BERRYHILL, Acting        :
Commissioner of Social Security,[1] :
                                  :
                 Defendant        :


## MEMORANDUM

On January 16, 2016, Plaintiff, Melissa Koger, filed this instant appeal[2]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[3] under Titles

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for prior Acting Commissioner, Carolyn W. Colvin, as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and 42 U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

**BACKGROUND**

Plaintiff protectively filed[4] her applications for DIB and SSI on September 23, 2012, alleging disability beginning on August 4, 2012, due to a combination of "Major Depression, Panic Disorder with Agoraphobia, Diabetes, Hypertension, Hypothyroidism, allergies, and Polycystic Ovarian Syndrome." (Tr. 12, 176).[5] These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on October 25, 2012. (Tr. 12). On December 14, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 12). On April 16, 2014, an oral hearing was held before administrative law judge Daniel

_____

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 4, 2016. (Doc. 8).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Myers, ("ALJ"), at which Plaintiff and vocational expert Andrew Caporale, ("VE"), testified. (Tr. 12). On July 23, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 8). On December 28, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-7). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 6, 2016. (Doc. 1). On April 4, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 7 and 8). Plaintiff filed a brief in support of her complaint on May 10, 2016. (Doc. 10). Defendant filed a brief in opposition on June 1, 2016. (Doc. 12). On June 9, 2016, Plaintiff filed a reply brief. (Doc. 13).

Plaintiff was born in the United States on June 11, 1967, and at all times relevant to this matter was considered a "younger individual."[7] (Tr. 173). Plaintiff completed two (2) years of college and can communicate in English. (Tr. 175, 177). Her employment records indicate that she previously worked as a collection

---

[7]. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

agent, credit analyst, and service representative. (Tr. 177). The records of the SSA reveal that Plaintiff had earnings in the years 1981 through 2012. (Tr. 170). Her annual earnings range from a low of two hundred six dollars and sixty cents ($206.60) in 1982 to a high of forty-five thousand one hundred forty-two dollars and three cents ($45,142.03) in 2009. (Tr. 170).

In a document entitled "Function Report - Adult" filed with the SSA on October 4, 2012, Plaintiff indicated that she lived in a house with her family. (Tr. 203). She noted that her illnesses, injuries or conditions limited her ability to work, stating:

> I have trouble driving because of head spins and being lightheaded and panic attacks. I can only stand to be around people for short periods and when I get home I'm completely exhausted. I can't remember things/ words. I forget what I'm doing and have to concentrate to remember. Other tasks are hard because I am always shaking . . .

(Tr. 203). She indicated that from the time she woke up until the time she went to bed, she took her medicine, slept, and separated herself from everyone. (Tr. 204). She had difficulty with personal care, noting that dressing, caring for her hair, and shaving were difficulty due to shakiness and lightheadedness. (Tr. 204). She was able to prepare meals daily, cleaned and did the laundry once a week, and shopped in stores for groceries and clothing. (Tr. 205-206). When asked to check which

items were affected by her illnesses, injuries, or conditions, Plaintiff did not check: lifting; squatting; bending; standing; reaching; walking; sitting; kneeling; hearing; stair climbing; or seeing. (Tr. 208).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, to go places, or to take her medicine. (Tr. 205, 207). She could pay bills, handle a savings account, count change, and use a checkbook as long as she "double checked [her]self." (Tr. 206). She noted that she could pay attention for about five (5) to ten (10) minutes at a time, did not finish what she started, had to re-read written instructions, and sometimes jumbled up spoken instructions. (Tr. 208).

Socially, Plaintiff noted it varied how often she left her home and that she was able to do so unaccompanied, but felt better when she was with someone she trusted. (Tr. 206). Her hobbies included reading, crafts, and motorcycle riding, the latter which she stated she no longer did because of difficulty concentrating and with hand coordination. (Tr. 207). The places she went on a regular basis included the doctor's office, pharmacy, and houses of immediate family members. (Tr. 207). Plaintiff noted she was able to drive to these places, but that she experienced panic attacks. (Tr. 206). Regarding spending time with others, she spent time talking to others daily. (Tr. 207). She had problems getting along with

family, friends, neighbors, authority figures, or others, explaining, "I find I can no longer tolerate negative or hyper people." (Tr. 208).

On February 18, 2013, Plaintiff completed a form titled "Activities of Daily Living." (Tr. 223-226). Plaintiff indicated that she: did the laundry every one (1) to two (2) weeks, with her husband carrying it for her; did the dishes as necessary; cleaned only when her husband could not clean due to her allergies and back problems; shopped for groceries every three (3) weeks when she was having a "good day" and would go early in the morning to avoid crowds; took care of her personal needs, but at twice the amount of time due to panic attacks; read books; drove about thirty-five (35) miles per month; visited family members every one (1) to two (2) months; did not attend social activities due to "too many people [and] noise;" slept between five (5) and eleven (11) hours a night; and took naps during the day. (Tr. 223-226).

During the oral hearing on April 16, 2014, Plaintiff testified that she was unable to work due to a combination of sleep problems, diabetes, panic attacks, and back problems. She reported that her panic attack symptoms included shaking uncontrollably, chest pressure, feelings of a heart attack, and rage. (Tr. 56-57). She stated that, as of late, she had experienced panic attacks and rage a couple of times a week, describing the rage as wanting to physically hurt someone

that was intrusive on her feelings of safety. (Tr. 57-58). She also experienced crying spells a few times a week. (Tr. 62). She stated that her ability to concentrate and focus was "all over the place." (Tr. 59). She also noted she had to take breaks for a length of time that was dependent on how much she had slept the night before and on how her back was feeling. (Tr. 59-60). Plaintiff testified she did very little driving because she was having "sleep issues" that caused her to fall asleep behind the wheel when her husband was in the car with her a year prior to the hearing. (Tr. 46-47).

## MEDICAL RECORDS

### A.  Medical Evidence

#### 1.  Katherine Curci, Ph.D, CRNP

On August 6, 2012, Plaintiff had an appointment with Katherine Curci, Ph.D, CRNP, after an episode of nausea, lightheadedness, and near fainting. The medications she was taking at the time of this appointment included Amlodipine-Benazepril; Levothyroxine; Montelukast; Sertraline; and Tranexamic Acid. (Tr. 332). Dr. Curci ordered lab work and instructed Plaintiff to take off work until her follow-up appointment. (Tr. 332).

On August 9, 2012, Plaintiff had a follow-up appointment with Dr. Curci. (Tr. 327). The medications she was taking at the time of this appointment

included Amlodipine-Benazepril; Levothyroxine; Montelukast; Sertraline; and Tranexamic Acid. (Tr. 327). Dr. Curci ordered more lab work and instructed Plaintiff to schedule an appointment with Dr. Chambers. (Tr. 330).

On February 14, 2013, Plaintiff had a follow-up appointment with Dr. Curci for thyroid disease, excessive malaise and fatigue, an enlarged thyroid, diabetes, hypertension, and "PTSD." (Tr. 590). Plaintiff reported she had not been sleeping well at night and felt excessively fatigued. (Tr. 590). An examination revealed a slightly enlarged thyroid. (Tr. 590). Dr. Curci ordered lab work and a thyroid ultrasound. (Tr. 590).

### 2. Linda Chambers, M.D.

On August 15, 2012, Plaintiff had an appointment with Linda Chambers, M.D., for follow-up of lab work and complaints of anxiety and not feeling well. (Tr. 322). It was noted that Plaintiff: had been taking Sertraline for anxiety as prescribed by Dr. Curci; had panic attacks at work with chest pressure; passed out at a recent wedding; did not have anxiety attacks at home; and experienced nervousness, dizziness, depression, tiredness, and headaches. (Tr. 322-323). Plaintiff's examination revealed she: was well-developed, well-nourished, and appropriately dressed; had good eye contact, but was tearful at times; had a regular heart without murmur or gallop; and had lungs clear to auscultation anteriorly and

posteriorly. (Tr. 323). Based on lab work done a few weeks prior, Dr. Chambers

diagnosed Plaintiff with diabetes with a "significantly elevated A1c." (Tr. 323).

Plaintiff was counseled to quit smoking as she noted she smoked a pack of

cigarettes per day, was given extensive counseling for her diet and exercise

program, was referred to the care coordinator Karen Newman for diabetes

education and support of anxiety, and was prescribed Metformin and aspirin. (Tr.

323).

On December 3, 2012, Plaintiff had an appointment with Dr. Chambers for

follow-up of her anxiety, diabetes, hyperlipidemia, and tobacco use. (Tr. 400).

On December 27, 2012, Plaintiff had an appointment with Dr. Chambers for

Polycystic Ovarian Syndrome. (Tr. 410).

### 3. <u>Karen Newman, MS, RN</u>

On August 23, 2012, Plaintiff had an appointment with Karen Newman,

MS, RN, for management of diabetes and anxiety. Plaintiff reported that she

wanted to get her anxiety under control, had been shaky and anxious while getting

ready for her appointment, and that she was unsure whether she was able to

function at work. (Tr. 319-320). Ms. Newman noted that Plaintiff was: tearful;

compliant with her diabetes and anxiety medications; was decreasing her once

"enormous" amount of intake of regular soda and energy drinks; not ready for

smoking cessation; and improving her glucose levels.  (Tr. 319-320).

###   4.   Debra Gray-Felty, MS

From August 30, 2012, through October 1, 2012, Plaintiff attended therapy appointments with Debra Gray-Felty, MS ("Ms. Gray-Felty").  (Tr. 365-368).  Plaintiff's self-reported symptoms included: an inability to "handle anything;" shakiness; a pounding heart; shortness of breath; a feeling like she was going to faint; anxiety when leaving her home; an inability to sleep; agitation; dizziness; lightheadedness; napping during the day; tiredness; feelings of wanting to be alone; poor concentration; nightmares; difficulty focusing; and ruminations.  (Tr. 365-368).  Ms. Gray-Felty noted Plaintiff was tearful and shaky and had a broad affect appropriate to the discussion.  (Tr. 365-368).  It was noted that Plaintiff's mother drove her to her appointments due to Plaintiff's poor concentration and fear of having a panic attack.  (Tr. 365-368).

###   5.   Karen Rizzo, M.D.

On August 7, 2012, Plaintiff had an appointment with Dr. Rizzo for evaluation of ongoing nasal and sinus congestion.  (Tr. 374).  Plaintiff reported she did not breathe well on the right side of her nose, had right ear fullness with right-sided ostiomeatal complex pressure, and experienced post-nasal drip and a decreased sense of smell.  (Tr. 374).  It was noted Plaintiff smoked a pack of

cigarettes a day and had numerous allergies. (Tr. 374). She had minimal relief with decongestants, antibiotics, and nasal sprays. (Tr. 374). Physical examination revealed: a deviated septum to the right obstructing eighty percent (80%) of the right side; narrowing of the right middle meatal area; and enlarged turbinates. (Tr. 374). Dr. Rizzo ordered a CT scan of the sinuses, prescribed a Z-Pak and Medrol dose pack for Plaintiff, and scheduled Plaintiff for a follow-up appointment. (Tr. 374).

On December 28, 2012, Plaintiff had an appointment with Dr. Rizzo for a recheck of chronic sinusitis. (Tr. 375). Plaintiff reported that it took her months to get back to Dr. Chambers because of anxiety attacks and trying to get her diabetes under control. (Tr. 375). It was noted she was still smoking a pack of cigarettes a day. (Tr. 375). The medications Plaintiff was taking at the time of this appointment included Amlodipine; aspirin; Benazepril; Clonazepam; Levothryoxine; Metformin; Montelukast; and Sertraline. (Tr. 377). Her physical examination revealed Plaintiff: was alert, oriented, and in no acute distress; had moderate nasal congestion with swollen inferior turbinates, a deviated septum on the left anterior and right posterior side, and a narrowed right middle meatus; had a normal mood and appropriate affect; had intact judgment; had good insight; and was orientated to time, place, and person. (Tr. 379). Plaintiff was diagnosed with

a deviated nasal septum, Concha Bullosa, hypertrophy of nasal turbinates, allergic rhinitis, and sinusitis of the maxillary sinuses of chronic nature. (Tr. 379). Dr. Rizzo recommended Plaintiff undergo a septoplasty, bilateral inferior turbinoplasty, bilateral resection of concha bullosa, and bilateral maxillary balloon sinuplasty. (Tr. 379).

### 6. **John A. Biever, M.D.**

On September 1, 2012, Plaintiff underwent a psychiatric evaluation performed by John A. Biever, M.D. (Tr. 363). Plaintiff's self-reported symptoms included: "reawaking" insomnia; not feeling rested; acrophobia; bouts of depression; and panic attacks. (Tr. 513). Plaintiff's mental status examination revealed she: was appropriately dressed; had a sad and worried facial expression; had no peculiarities of movement or speech; had a depressed mood and affect appropriate to this mood; had intact practical judgment; and had perfect recall of "3 of 3 items after several minutes, intact abstractions, [and] accurate subtraction of serial 3's." (Tr. 514). The medications she was taking at this appointment included: Metformin; Zoloft; Synthroid; allergy shots; Singulair; and Amlodipine. (Tr. 513). Dr. Biever stated, "[u]ltimately the patient has been experiencing panic attacks when she knows she has to travel to be somewhere." (Tr. 513). It was noted that Plaintiff had "chronic, serious and complicated psychiatric condition[s]

12

including Major Depression and Panic Disorder with Agoraphobia, further complicated by chronic physical disorders including diabetes mellitus and hypertension." (Tr. 363). Dr. Biever stated, "[t]hese conditions cause [Plaintiff] intolerable anxiety and exacerbation of her physical illnesses when she is exposed to the stresses she routinely faces at the workplace. At this point she experiences a significant increase in anxiety upon leaving her house for any reason." (Tr. 363). Dr. Biever noted Plaintiff had been attending psychotherapy sessions, and that her response to medication has been positive, but slow "given the chronic and complicated nature of her illness." Dr. Biever opined, "employment is currently contraindicated for [Plaintiff]," and that he could not predict when she would become employable again. (Tr. 363).

From September 5, 2012 through July 27, 2013, Plaintiff had follow-up appointments with Dr. Biever. (Tr. 516-517, 639-640). Her medications included Zoloft, Clonazepam, and Prazosin. (Tr. 516, 639-640). Her symptoms included: anticipatory anxiety; nightmares; tremors; a depressed mood; anger; panic; insomnia; and depression. (Tr. 516-517, 639-640).

### 7.    Joan L. Brauckmann, M.D.

On July 3, 2013, Plaintiff had an initial appointment with Dr. Brauckmann to initiate immunotherapy for allergic rhinitis and her allergies to dust mites and

mold.  (Tr. 631).  It was noted that Plaintiff had received immunotherapy from a previous physician and that this therapy, along with Singulair and Nasonex, helped to control her allergies.  (Tr. 631).  Plaintiff's other self-reported symptoms included depression and anxiety.  (Tr. 633).  A physical examination of Plaintiff revealed a nasal mucosa that was pale and boggy with moderate engorgement of the turbinates and clear drainage and papular excoriations on the upper arms and back.  (Tr. 633).  Plaintiff was tested for allergies, which revealed she was allergic to mold, dust mites, cockroaches, and mice.  (Tr. 634).  The plan was for Plaintiff to continue taking Singulair and Naxonex, to continue on immunotherapy "with the serum she brought from Pennsylvania," and to follow-up in six (6) months or sooner.  (Tr. 634).

### 8.    Barbara J. Trandel, M.D.

On October 3, 2013, Plaintiff had an appointment with Dr. Trandel to establish herself as a new patient after moving from Pennsylvania.  (Tr. 653).  Plaintiff's self-reported symptoms included daytime fatigue; somnolence; snoring; a rash; back pain; and allergies.  (Tr. 654).  A physical examination revealed Plaintiff had: a well-nourished, well developed appearance; a normal gait and station; intact recent and remote memory; an appropriate mood and affect; and widespread erythematous papules.  (Tr. 654).  It was noted Plaintiff was receiving

14

disability retirement and a federal pension. (Tr. 654). Dr. Trandel prescribed the following medications: Levothyroid; Glucophage; Prazosin; Lotrel; Clonazepam; Sertraline; and Bactrim. (Tr. 655).

On October 21, 2013, Plaintiff had an appointment with Dr. Trandel for follow-up of her Diabetes and recent sinus congestion. (Tr. 650). It was noted Plaintiff was still smoking a pack of cigarettes a day. (Tr. 650). A physical examination revealed normal gait and station; intact cranial nerves; and a normal thyroid without nodules or tenderness. (Tr. 651). Dr. Trandel instructed Plaintiff to continue on Metformin for Diabetes, to stop smoking, and to schedule an appointment with a psychiatrist for Depression and Panic Disorder with Agoraphobia. (Tr. 651).

On March 19, 2014, Plaintiff had an appointment with Dr. Trandel for diabetes and her other various medical issues. (Tr. 647). Her physical examination revealed: intact recent and remote memory; an appropriate mood and affect; orientation to time, place, and person; and a well-developed, well-nourished appearance. (Tr. 648). Plaintiff was assessed as having a sleep disorder, Diabetes, Hypothyroidism, Sinusitis, Panic Disorder with Agoraphobia, Post-Traumatic Stress Disorder; Depressive Disorder; Anxiety Disorder; Hypertension; and Obesity. (Tr. 648). Dr. Trandel ordered a sleep study for

Plaintiff's self-reported insomnia, prescribed Doxycycline for sinusitis, and instructed Plaintiff to schedule a diabetic eye exam.  (Tr. 648).

### 9.  Sherri L. Wright, DC

From September 17, 2013, through April 7, 2014, Plaintiff had appointments with chiropractor Dr. Wright for back and neck pain.  (Tr. 675-709). Plaintiff described her pain as a "continuous aching and throbbing discomfort in the back of the neck" that decreased with movement and was rated at a seven (7) out of ten (10) on the pain scale approximately eighty percent (80%) of the time. (Tr. 687).  She also described having pain in her upper back that she rated at a four (4) of ten (10) on the pain scale approximately forty percent (40%) of the time. (Tr. 687).  She additionally had pain in her mid and lower back rated at a six (6) to seven (7) out of ten (10) on the pain scale approximately seventy percent (70%) of the time.  (Tr. 687).  Further, she noted she had pain in her right hip and back of the her hands.  (Tr. 687-688).  Physical examination revealed: a head tilt to the right with a high right shoulder, thoracic hyperhyphosis and rotation of the trunk to the right; subluxations in the cervical, thoracic, lumbar, and lubosacral region; edema in the cervical, thoracic, and lumbar regions; spasms in the right cervical dorsal area, right upper thoracic area, bilateral mid thoracic area and lumbosacral region; a significant decrease of normal range of motion in the cervical flexion,

cervical extension, right lateral cervical flexion, left lateral cervical flexion, left cervical rotation, lumbodoral extension, lumbodoral flexion, right lateral lumbar flexion, left lateral lumbar flexion, right lumbodorsal rotation, and left lumbodoral rotation; active trigger points in the suboccipital, cervical musculature, upper trapezius, middle trapezius, lower trapezius, scapular, thoracic paraspinal, lumbar paraspinal, gluteus medius and minimus, prirofrmis, gluteal and hip regions; a positive test for myofascitis; a positive cervical compression test; a positive downward pressure test on the top of the head that resulted in radiating spinal pain; a positive Milgram's test; a positive Yeoman's test bilaterally; a positive bilateral palpation of the sciatic nerve; a positive Kemp's Test on the right shoulder indicative of a disc protrusion or prolapse; a positive Shoulder Depression test bilaterally; and multiple subluxations with spasm, hypomobility, and end point tenderness at the C3, C4, C5, C6, C7, T4, T5, T6, T7, L4, L5, and sacrum. (Tr. 688-690). Dr. Wright ordered x-rays of Plaintiff's cervical and lumbar spines. (Tr. 684-686). Dr. Wright assessed Plaintiff as having cervicalgia and lumbalgia with a history of lumbar spine disc herniation and pain in the bilateral sacroiliac joints. (Tr. 690). Plaintiff received diversified chiropractic manipulative therapy and myofascial release. (Tr. 699-701, 704, 707, 709). Plaintiff's final prognosis was listed as fair. (Tr. 709).

### 10.     Cecil Holliman, M.D.

On April 28, 2013, Plaintiff had an appointment with Dr. Holliman after she twisted her right foot. (Tr. 718). A physical examination revealed: a scattered papular erythematous rash; mild tenderness with no significant swelling of the right foot in the distal area with a normal range of motion; and a normal exam of the legs bilaterally. (Tr. 720). Dr. Holliman ordered an x-ray of Plaintiff's right foot to rule out fracture(s). (Tr. 720).

### B.     Medical Opinions

### 1.     John A. Biever, M.D.- Treating Physician

### a.     September 1, 2012

On September 1, 2012, Dr. Biever opined "employment is currently contraindicated for [Plaintiff]," and that he could not predict when she would become employable again. (Tr. 363).

### b.     February 10, 2013

On February 10, 2013, Dr. Biever completed a "Mental Impairment Questionnaire" for Plaintiff. (Tr. 524). Dr. Biever identified the following as Plaintiff's signs and symptoms resulting from her mental impairments: anhedonia; decreased energy; a blunt, flat, or inappropriate affect; sleep and mood disturbances; difficulty thinking or concentrating; recurrent and intrusive

recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; apprehensive expectation; emotional withdrawal or isolation; autonomic hyperactivity; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; and persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation. (Tr. 525). Her Axis I diagnoses included Major Depressive Disorder and Panic Disorder with Agoraphobia. (Tr. 524). Dr. Biever noted that Plaintiff had a positive response to treatment, including Sertraline and Clonazepam, but that it was a gradual response in proportion to the severity of symptoms. (Tr. 524). Dr. Biever noted that persisting agoraphobia and panic attacks in public places were the clinical findings that demonstrated the severity of Plaintiff's mental impairments, and gave Plaintiff a guarded prognosis. (Tr. 524).

In terms of "B" criteria for Impairment Listings, Dr. Biever opined that Plaintiff: (1) had moderate restriction of activities of daily living; (2) had marked difficulties in maintaining social functioning; (3) had moderate difficulties in maintaining concentration, persistence, or pace; and (4) had experienced four (4) or more episodes of decomepnsation within a twelve (12) month period, each

lasting at least two (2) weeks in duration.  (Tr. 528).

Dr. Biever then opined Plaintiff had limited, but satisfactory, ability to: remember work-like procedures; understand, remember, and carry out simple instructions; be aware of normal hazards and take appropriate precautions; and adhere to basic standards of neatness and cleanliness.   (Tr. 526-527).  Dr. Biever also opined Plaintiff was seriously limited, but not precluded from: making simple work-related decisions; asking simple questions or requesting assistance; responding appropriately to changes in a routine work setting; understanding, remembering, and carrying out detailed instructions; and setting realistic goals or making plans independently of others.  (Tr. 526-527).  Dr. Biever further opined that Plaintiff was unable to meet competitive standards in the following areas: maintaining attention for two (2) hour segments; maintaining regular attendance and punctuality within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting

them or exhibiting behavioral extremes; dealing with normal work stress; and dealing with stress of semi-skilled and skilled work. (Tr. 526-527). Dr. Biever additionally opined Plaintiff had no useful ability to function in the following areas: interacting appropriately with the general public; traveling in unfamiliar places; and using public transportation. (Tr. 527). Dr. Biever explained that these limitations are supported by the fact that Plaintiff's trauma-related anticipatory anxiety and panic attacks are precipitated by typical daily situational and interpersonal job stresses. (Tr. 526).

Dr. Biever further opined that Plaintiff: (1) had "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home;" (2) would be absent from work more than four (4) days per month; (3) had mental health impairments that would be expected to last at least twelve (12) months; and (4) would have difficulty working at a regular job on a sustained basis because "[r]ecovery will be slow due to post-traumatic, chronic history of relationship disturbances." (Tr. 529).

### 2. Katherine M. Curci, Ph.D., CRNP

On March 6, 2013, Dr. Curci completed a "Diabetes Mellitus Residual Functional Capacity Questionnaire" for Plaintiff. (Tr. 531-534). Dr. Curci noted that Plaintiff's diagnoses included Hypothyroidism, Diabetes, Hypertension, and

Hyperlipidemia. (Tr. 531). Dr. Curci identified Plaintiff's symptoms as fatigue, general malaise, headaches, and hyper/hypoglycemic attacks. (Tr. 531). Dr. Curci opined: (1) Plaintiff's impairments would be expected to last at least twelve (12) months; (2) Plaintiff's symptoms would rarely be severe enough to interfere with attention and concentration needed to perform even simple work tasks; (3) Plaintiff was capable of tolerating low stress jobs; and (4) Plaintiff would be absent about three (3) days per month. (Tr. 532). Dr. Curci also opined that Plaintiff: could sit for no more than two (2) hours before needing to get up; could stand for no more than one (1) hour before needing to change positions or walk around; could stand and/ or walk for less than two (2) hours in an eight (8) hour workday; could sit for about two (2) hours in an eight (8) hour work day; would need periods of walking around every fifteen (15) minutes for five (5) minutes at a time during an eight (8) hour workday; would need a job that permitted shifting positions at will from sitting, standing, or walking; would need to take two (2) to three (3) unscheduled breaks lasting for fifteen (15) to thirty (30) minutes each, and involving sitting quietly, in an eight (8) hour workday; could rarely lift and/ or carry up to and including ten (10) pounds and never lift and/ or carry anything over ten (10) pounds; could occasionally twist and stoop/ bend; could rarely crouch/ squat; could never climb ladders or stairs; had no limitations with

fingering, reaching, or handling; should avoid even moderate exposure to extreme cold and heat, high humidity, wetness, cigarette smoke, perfumes, and dust; and should avoid all exposure to soldering fluxes, solvents/ cleaners, fumes, odors, gases, and chemicals. (Tr. 523-534).

### 3. Aroon Suansillppongse, M.D.- Consultative Examiner

On March 6, 2013, Dr. Suansillppongse completed a "Psychiatric Review Technique" for Plaintiff based on a review of her medical records. (Tr. 535-545). Dr. Suansillppongse opined that Plaintiff's mental impairments fell under Impairment Listings: 12.04, Affective Disorders; 12.06, Anxiety-Related Disorders; and 12.09, Substance Addiction Disorders. However, Dr. Suansillppongse noted that Plaintiff did not meet the "B" criteria of these Listings, opining Plaintiff had: (1) mild restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) one (1) to two (2) repeated episodes of decompensation, each of extended duration. (Tr. 543). He further opined Plaintiff did not meet the "C" criteria for these Listings. (Tr. 544).

On March 6, 2013, Dr. Suansillppongse also completed a "Mental Residual Functional Capacity Assessement" form for Plaintiff based on the records up to that date. (Tr. 546-548). Dr. Suansillppongse opined Plaintiff was moderately

limited in the ability to: maintain attention and concentration for extended periods of time; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independent of others. (Tr. 546-547). Dr. Suansillppongse opined Plaintiff was not significantly limited in all other categories. (Tr. 546-547).

### 4. <u>Kristina Jahng, M.D.- Treating Psychiatrist</u>

On March 18, 2014, Dr. Jahng completed a "Mental Impairment Questionnaire" for Plaintiff. (Tr. 656-661). She noted that Plaintiff: had started therapy with her on November 6, 2013, and medication management with her on November 15, 2013; had a minimal response to treatment, including Sertraline and Klonopin, with the side effect of difficulty sleeping; and had a fair to good prognosis with these medications. (Tr. 656). Dr. Jahng noted that Plaintiff's signs and symptoms included: anhedonia; appetite and sleep disturbances; decreased energy; generalized persistent anxiety; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source

of marked distress; persistent disturbances of mood or affect; apprehensive expectation; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; emotional lability; deeply ingrained, maladaptive patterns of behavior; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; and a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation. (Tr. 657-658). Dr. Jahng stated that the clinical findings that demonstrate the severity of Plaintiff's mental impairments and symptoms included severe, daily anxiety that was incapacitating and caused a fear of driving; difficulty sleeping; spontaneously falling asleep; and panic attacks that occurred without a trigger. (Tr. 656).

In terms of "B" criteria for Impairment Listings, Dr. Jahng opined that Plaintiff: (1) had moderate restriction of activities of daily living; (2) had marked difficulties in maintaining social functioning; (3) had marked difficulties in maintaining concentration, persistence, or pace; and (4) had experienced one (1) or two (2) episodes of decomepnsation within a twelve (12) month period, each lasting at least two (2) weeks in duration. (Tr. 660).

Dr. Jahng opined that Plaintiff had a limited but satisfactory ability to:

remember work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; be aware of normal hazards and take appropriate precautions; understand, remember, and carry out detailed instructions; interact appropriately with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (Tr. 658-659). Dr. Jahng then opined that Plaintiff was seriously limited, but not precluded in, the ability to: maintain attention for two (2) hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; set realistic goals or make plans independently of others; and use public transportation. (Tr. 658-659). Further, Dr. Jahng opined Plaintiff was unable to meet competitive standards in: working in coordination with or proximity to others without being unduly distracted; accepting instructions and responding appropriately to criticism from supervisors; dealing with stress of semiskilled and skilled work; and traveling in unfamiliar places. (Tr. 658-659). Additionally, Dr. Jahng opined Plaintiff had no useful

ability to function in terms of: completing a normal workday and workweek without interruptions from psychologically-based symptoms; and dealing with normal work stress. (Tr. 658-659). Dr. Jahng further opined that Plaintiff: (1) had a medically documented history of a mental disorder of at least two (2) years' duration that caused more than a minimal limitation of the ability to do any basic work activity, with symptoms or signs attenuated by medication or psychosocial support with a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; (2) had "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home" due to panic attacks and spontaneous sleep; (3) would be absent from work more than four (4) days per month; and (4) had mental health impairments that would be expected to last at least twelve (12) months. (Tr. 660-661).

### 5. **Joan Brauckmann, M.D.**

On April 7, 2014, Dr. Brauckmann opined Plaintiff had to: (1) avoid concentrated exposure to wetness, cigarette smoke, perfumes, soldering fluxes, solvents, cleaners, fumes odors, gases, and chemicals; (2) avoid even moderate exposure to dust; and (3) avoid all exposure to mold and mildew. (Tr. 668).

27

### 6.   **Barbara Trandel, M.D.**

On March 29, 2014, Dr. Trandel completed a Medical Source Statement for Plaintiff's Diabetes, Hypothryoidism, Hypertension, Obesity, Trigeminal Neuralgia, and Hyperlipidemia.  (Tr. 710-721).  Dr. Trandel opined that Plaintiff would be unable to perform or be exposed to: public contact; routine, repetitive tasks at a consistent pace; detailed or complicated tasks; strict deadlines; close interaction with coworkers/ supervisors; fast-paced tasks; and exposure to work hazards such as heights or moving machinery.  (Tr. 711).  Dr. Trandel opined, based on Plaintiff's self-reported symptoms, that Plaintiff: could walk four (4) city blocks without rest or severe pain; could sit for one (1) hour before needing to lie down; could stand for two (2) hours before needing to lie down; could sit, stand, and/ or walk for up to about two (2) hours in an eight (8) hour workday; would require seven (7) breaks lasting up to twenty (20) minutes during an average eight (8) hour workday; could occasionally lift and carry ten (10) pounds; could rarely lift and carry twenty (20) pounds; could never lift and carry up fifty (50) pounds; could grasp, twist, and turn objects for only twenty (20) to thirty (30) percent of the time with both hands in an eight (8) hour workday; could perform fine manipulations only fifty (50) percent of the time with both hands in an eight (8) hour workday; could reach with her arms only forty (40) percent of the time with

both hands in an eight (8) hour workday; could occasionally twist, stoop, bend, crouch, and squat; could rarely climb ladders; could never climb stairs; should avoid moderate exposure to extreme heat and cold, high humidity, wetness, cigarette smoke, perfumes, and dust; and should avoid all exposure to soldering fluxes, solvents, cleaners, fumes, odors, and gases. (Tr. 712-713; 715-717). Dr. Trandel also opined that Plaintiff's prognosis for both her Diabetes and Hypothryoidism was good and that neither would have a significant impact on her physical abilities. (Tr. 710, 713-714). Finally, Dr. Trandel opined that Plaintiff would be absent from work more than four (4) days a month. (Tr. 717).

### 7. Jonathan Rightmyer, Ph.D.- State Agency Physician

On October 25, 2012, Dr. Rightmyer completed a "Psychiatric Review Technique" form and a "Mental Residual Functional Capacity" form for Plaintiff based on a review of Plaintiff's records up to that date. (Tr. 84-90). Dr. Rightmyer opined that Plaintiff's mental health impairments did not meet the "B" criteria for Impairment Listings 12.04, Anxiety Disorder, or 12.06, Affective Disorders, because she had: (1) mild restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation of extended duration. (Tr. 87). Dr. Rightmyer also opined that

Plaintiff's impairments did not meet the "C" criteria for the aforementioned Listings.  (Tr. 87).

In the Mental Residual Functional Capacity form, Dr. Rightmyer opined Plaintiff was moderately limited in the ability: to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; and to interact appropriately with the general public.  (Tr. 89-90).

### C.  Tests

#### 1.  Stress Echocardiogram

On October 5, 2012, Plaintiff underwent a stress echocardiogram.  (Tr. 344-345).  The test was negative for ischemia and noted Plaintiff had "average exercise tolerance for age and gender."  (Tr. 345).

#### 2.  CT Scan of Sinuses

On November 16, 2012, Plaintiff underwent a CT scan of the paranasal sinuses for right-sided maxillary sinus pain with congestion.  (Tr. 372).  The test revealed: some inflammatory changes in the maxillary sinuses bilaterally; patent ostiormeatal units and nasofrontal passages; bilateral concha bullosa of the middle turbinate; and mild nasoseptal deviation to the right.  (Tr. 372).

### 3.    Ultrasound of the Head and Neck

On February 20, 2013, Plaintiff underwent an ultrasound of her head and neck for suspicion of an enlarged thyroid with a history of hypothyroidism.  (Tr. 583).  The impression was that the thyroid was multinodular, most likely reflecting nodular hyperplasia.  (Tr. 583).

### 4.    Radiology of the Spine

On September 23, 2013, Plaintiff underwent radiology of her spine.  (Tr. 669-670).  The impression was that Plaintiff had: "moderate productive changes of the facet joints at L4-5 and L5-S1 [and] [a]ssociated grade 1 anterolisthesis of L4 on L5, which increases in flexions;" mild osteoarthritic changes of the sacroiliac joints; and mild cervical spondylosis, greatest at C4-5 through C6-7.  (Tr. 669-670).

### 5.    X-ray of Right Foot

On April 28, 2013, Plaintiff underwent an x-ray of her right foot.  (Tr. 722).  The impression was that Plaintiff had bipartite appearance of the more medial of the two (2) sesamoid bones underlying the distal first metatarsal bone that correlated with acute tenderness.  (Tr. 722).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2017. (Tr. 14). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of August 4, 2012. (Tr. 14).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of the following impairments: "Cervical and Lumbar Degenerative

---

[8]. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Disc Disease, Panic Disorder with Agoraphobia, Major Depressive Disorder, Diabetes, and Allergic Rhinitis (20 C.F.R. 404.1520(c))." (Tr. 14-15).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 15-17).

At step four, the ALJ determined that Plaintiff had the RFC to less than a full range of light work with limitations. (Tr. 17-21). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform less than the full range of light work as defined in 20 CFR 404.1567(b) in that she must be allowed to alternate positions at will. She is limited to occasional bending, stooping, crawling, kneeling, crouching, and climbing stairs. [Plaintiff] must avoid hazards such as unprotected heights and non-stationary machinery moving about on the job sit floor, such as forklifts. She should not be exposed to pulmonary irritants, wetness, humidity, odors, gases, and fumes. [Plaintiff] is limited to exercising only simple work-related judgments. She is limited to performing routine, repetitive work in a stable environment. [Plaintiff] should have no interactions with members of the public, but may tolerate occasional interactions with coworkers and supervisors. [Plaintiff] cannot be expected to work with coworkers as part of a team, and cannot be expected to engage in independent planning and goal setting.

(Tr. 17).

At Step Five, the ALJ determined that although Plaintiff was not capable of performing past relevant work, "[c]onsidering the [Plaintiff]'s age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (Tr. 21-23).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between August 4, 2012, the alleged onset date, and the of the ALJ's decision. (Tr. 23).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ erred in finding Plaintiff's Panic Disorder with Agoraphobia and Major Depressive Disorder did not meet or equal Impairment Listings 12.04 and 12.06; (2) substantial evidence does not support the ALJ's RFC assessment; (3) substantial evidence does not support the ALJ's evaluation of the opinion evidence of Dr. Biever and Dr. Jahng; and (4) substantial evidence does not support the ALJ's credibility evaluation. (Doc. 10, pp. 14-35). Defendant disputes these contentions. (Doc. 12, pp. 10-27).

### 1. Residual Functional Capacity Determination

Plaintiff asserts that the ALJ erred in the weight he afforded to the opinions of Dr. Rightmyer and Dr. Suansillppongse because they were rendered before Plaintiff treated with both Dr. Biever and Dr. Jahng. (Doc. 10, pp. 24-32).

Defendant argues, in part, that these state agency physicians had a chance to review a complete medical record, and, therefore substantial evidence supports the weight the ALJ afforded to the opinions of record regarding Plaintiff's mental health impairments. (Doc. 12, pp. 13).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. It is recognized that the RFC assessment must be based on a consideration of all the evidence in the record, including the testimony of the Plaintiff regarding activities of daily living, medical records and opinions, lay evidence, and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir. 2000). The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including a claimant's symptoms, diagnosis and prognosis, what a claimant can still do despite impairments(s), and a claimant's physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the

Third Circuit Court of Appeals and by all of the federal circuits. <u>See</u>, <u>e.g.</u>, <u>Morales v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." <u>Morales</u>, 225 F.3d at 317; <u>Plummer</u>, 186 F.3d at 429; <u>see also</u> 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." <u>Morales</u>, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996

SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added).

Regardless of the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation, or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility."

Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Furthermore, the Third Circuit has not upheld any instance, in any precedential opinion, in which an administrative law judge has assigned less controlling weight to an opinion rendered by a treating physician based on an opinion from a non-treating, non-examining examiner who did not review a complete case record. See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011) (holding that the administrative law judge did not err in affording more weight to a medical opinion rendered by a non-examining physician because the physician testified at the oral hearing and had a chance to review the entire case record) (emphasis added); Brownawell v. Commissioner of Social Security, 554 F.3d 352 (3d Cir. 2008) (holding that three (3) non-treating opinions were not sufficient to reject a treating source medical opinion because they were "perfunctory' and omitted significant objective findings promulgated after the non-treating opinions were issued); Morales, 225 F.3d at 314 (holding that remand was proper because the claimant's residual functional capacity was based on an opinion rendered by a non-treating, non-examining physician who "review[ed] [claimant's] medical

record which . . . did not include [two physicians'] reports" and was thus based on an incomplete medical record).

In the case at hand, regarding the medical opinion evidence involving Plaintiff's mental health impairments, the ALJ gave limited weight to the aforementioned opinion of treating psychiatrist Dr. Jahng, who began treating Plaintiff in November 2013 and rendered an opinion as to Plaintiff's limitations resulting from her mental health impairments in March 2014. (Tr. 20). The ALJ also gave limited weight to the opinion of Plaintiff's treating physician, Dr. Biever. (Tr. 20). Overall, he stated these opinions should be given limited weight because they are unsupported by the record. (Tr. 20). Instead, the ALJ gave significant weight to the opinions of Dr. Rightmyer and Dr. Suansillppongse, both non-examining, consultative examiners, because both "were able to review [Plaintiff]'s full, available medical records prior to issuing their determinations" and both were consistent with the record. (Tr. 20).

Upon review of the medical records and the ALJ's RFC determination and in accordance with the aforementioned binding Third Circuit precedent, this Court finds issue with the ALJ's reliance on the opinions of Dr. Rightmyer and Dr. Suansillppongse because they were rendered in October 2012 and March 2013, before Plaintiff completed treatment with both Dr. Biever and Dr. Jahng for her

mental health impairments and before Dr. Jahng rendered her opinion regarding Plaintiff's limitations resulting from her mental health impairments. (Tr. 516-517, 639-640, 656). Through July 2017, Plaintiff treated with Dr. Biever, who noted Plaintiff suffered from symptoms such as: anticipatory anxiety; nightmares; tremors; a depressed mood; anger; panic; insomnia; depression. (Tr. 516-517, 639-640). In March 2014, Dr. Jahng stated that: (1) Plaintiff had a minimal response to treatment, including Sertraline and Klonopin, with the side effect of difficulty sleeping; and (2) the clinical findings that demonstrate the severity of Plaintiff's mental impairments and symptoms included severe, daily anxiety that was incapacitating and caused a fear of driving, difficulty sleeping, spontaneous sleep, and panic attacks that occurred without a trigger. (Tr. 656). The lack of availability of this medical evidence and opinion to the state agency physicians who rendered opinions that were relied on by the ALJ in formulating the RFC renders the RFC determination defective in light of the aforementioned Third Circuit precedent. As such, it is determined that substantial evidence does not support the significant weight the ALJ afforded to the opinions of the non-treating, non-examining physicians, Dr. Rightmyer and Dr. Suansillppongse, in determining Plaintiff's mental health RFC because these opinions were based on a review of a incomplete medical record. Therefore, remand on this basis is

necessary.

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: October 11, 2017

/s/ **William J. Nealon**
**United States District Judge**